FILED '08 JUL 11 12:03 USDC-ORE

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

NICO C. COURTNEY,                    )
                                     )
            Plaintiff,               )    Civ. No.   06-6223-TC
                                     )
      vs.                            )
                                     )
                                     )    ORDER AND OPINION
                                     )
OREGON DEPARTMENT OF STATE           )
POLICE, and Agency of the            )
State of Oregon, and JAMES           )
RAGON,                               )
                                     )
            Defendants.              )
_____)

Coffin, Magistrate Judge:

    Plaintiff, formerly employed by the Oregon State Police
(OSP), brings a number of state and federal claims against his
OSP and one of its officials.   Before the court are defendant
James Ragon's Motion for Summary Judgment (#45) and defendant
OSP's Motions for Summary Judgment (#42 and #59).   For the
reasons that follow, the motions are granted and the claims
dismissed.

## Background

    The following summary of facts is drawn from the record

1 Opinion and Order

before the court; additional facts are included as necessary in the analysis of particular claims. Plaintiff, a Native American male, was employed as a detective in the Tribal Gaming Section (TGS) in OSP from September 2000 until August 2005. During his work at TGS, plaintiff was supervised by Sgt. Charles Burdick and Randy Westbook prior to February 2005, and then by defendant Sgt. James Ragon from February 2005 until August 8, 2005. Lt. Alfred C. Bathke was plaintiff's second-line supervisor from April 2004 until August 8, 2005.

Sometime between 1998 and 2001, plaintiff reported to Burdick that he was offended by statements Burdick made concerning the competency of Native Americans employed by TGS. Plaintiff testified that Burdick referred to particular Native American tribal members as unintelligent, and referred to members of the particular tribe to which plaintiff belonged as "ugly." Sometime between 2000 and 2004, plaintiff complained to Westbrook about racial bias for having made statements similar in tone to those of Burdick.

He also complained to Westbook about TGS billing practices. In particular, plaintiff expressed concern about procedures for billing drive time between Salem and casinos, accounting for time worked in the capacities of vendor detective and casino oversight, accounting for time spent moving through casinos and interacting with various casino personnel, billing time spent doing work for one casino to a second casino that was used as the workspace, and billing in 30 minute increments for work or communications that took 10 or 15 minutes. He testified that he did not know whether such practices resulted in increased charges

2 Opinion and Order

to Native American tribes who administered casinos.

During the course of his employment, Ragon requested that colleagues assist plaintiff with his report writing in order to correct certain deficiencies.

In addition to that single performance problem, plaintiff had a history of personnel investigation and discipline. In 2003, plaintiff was investigated and disciplined for missing work due to alcohol intoxication. In March 2005, plaintiff was investigated and disciplined for exceeding his allowable break time and billing portions of his break time to gaming vendors, whom OSP billed for licencing investigation costs. In July 2005, a colleague reported to Bathke that plaintiff viewed inappropriate materials on a state computer during work hours. Ragon, who investigated the complaint, was notified that plaintiff had deleted certain files from his computer. Ragon seized plaintiff's computer in the course of the investigation. Plaintiff was provided with notice of the investigation into his conduct and was represented by his union during the investigative process. He resigned before the investigation into his computer use was completed. Plaintiff admitted that he had violated OSP rules by viewing DVDs and internet sites featuring nudity and sexual activity while at work.

On August 8, 2005, plaintiff resigned from OSP. In his resignation letter, he stated that Ragon violated OSP policy by taking employees to his home during work hours. He also stated that he was offended by the display of <u>Single Handed</u>, a copy of a Charles Russell lithograph that allegedly hung in Ragon's

office[1] and depicts a mounted policeman pointing a rifle at a Native American, and by other artwork depicting the confederate army displayed in Ragon's home.    Before resigning he did not bring a formal complaint against Ragon for these concerns, nor did he notify any supervisor.

Plaintiff now brings claims against his former supervisor, James Ragon, for violation of due process, freedom of speech, and equal protection rights pursuant to 42 U.S.C. section 1983. Against defendant OSP, plaintiff brings claims for violations of Title VII and Or. Rev. Stat. section 659A.030(1) and state whistleblowing laws, and for the torts of intentional infliction of emotional distress and wrongful discharge.[2]    Summary judgment is awarded in defendants' favor on all claims.

## Legal Standard

Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."    Fed. R. Civ. P. 56(c).    The initial burden is on the moving party to point out the absence of any genuine issue of material fact.    Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried.    Celotex Corp. v.

[1] Ragon disputes the assertion that the lithograph was displayed in his office at TGS.

[2] Plaintiff has conceded that he cannot prevail on his section 1981 claim and state and federal retaliation discrimination claims against OSP; the court accepts the concession and awards summary judgment in OSP's favor on these claims.

4 Opinion and Order

Catrett, 477 U.S. 317, 323 (1986).  Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.  The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.  Id. at 32.  There is also no genuine issue of fact if, on the record taken as a whole, a rational trier of fact could not find in favor of the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Taylor v. List, 880 F.2d 1040 (9th Cir. 1989).

On a motion for summary judgment, all reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party.  Hector v. Wiens, 533 F.2d 429, 432 (9th Cir. 1976).  The inferences drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion.  Valadingham v. Bojorquez, 866 F.2d 1135, 1137 (9th Cir. 1989).  Where different ultimate inferences may be drawn, summary judgment is inappropriate.  Sankovich v. Insurance Co. of North America, 638 F.2d 136, 140 (9th Cir. 1981).

## Analysis

I.  Section 1983 Due Process Claims

5 Opinion and Order

Plaintiff brings these claim against defendant Ragon only. For the following reasons, Ragon's motion for summary judgment on the due process claims is granted.

Substantive Due Process

In order to withstand summary judgment on a section 1983 claim based on substantive due process in the public employment context, the record must disclose a genuine issue of material fact indicating that the employer has taken actions that effectively foreclose the plaintiff employee from a particular occupation. Engquist v. Oregon Dep't of Agric., 478 F.3d 985, 996-98 (9th Cir. 2007), aff'd, 128 S. Ct. 2146 (2008). The claim is limited "to extreme cases, such as a government blacklist, which when circulated or otherwise publicized to prospective employers effectively excludes the blacklisted individual from his occupation, much as if the government had yanked the license of an individual in an occupation that requires licensure." Id. at 997-98 (internal quotation marks and citation omitted).

Here, plaintiff has not alleged that Ragon acted to blacklist him from future employment in the law enforcement profession, and no evidence in the record gives rise to a genuine issue of material fact on this issue. Inasmuch as plaintiff alleges that he was deprived of substantive due process, summary judgment on such a claim is awarded in favor of Ragon.

Procedural Due Process

Plaintiff asserts that he had a property interest in his job and compensation and a personal liberty interest to be free from a coerced visit to Ragon's home during work hours, and that he was deprived of those interests without due process. In order to

6 Opinion and Order

withstand summary judgment on a section 1983 claim based on procedural due process, plaintiff must demonstrate the existence of a genuine issue of material fact on each of the following elements: (1) plaintiff possessed a property or liberty interest, (2) he was deprived of that interest, and (3) the deprivation was effected without due process. Portman v. County of Santa Clara, 995 F.2d 898, 904 (9th Cir. 1993).

Whether or not plaintiff can demonstrate a property interest in his job, see Board of Regents v. Roth, 408 U.S. 564, 577 (1972) (deprivation of a property interest, as defined by state law, is required to state a section 1983 procedural due process claim), the record does not disclose a genuine issue of material fact on the question of whether he was deprived of that interest without due process. Plaintiff's theory is predicated on the presumption that he was deprived of employment because he was constructively discharged. However, the record indicates that Ragon did not make plaintiff's working environment so intolerable as to reasonably warrant plaintiff's resignation.

The constructive discharge doctrine effectively imputes to the employer responsibility for terminating an employee when the employer creates conditions so abominable that resignation becomes a reasonable course of action. Thus, an employee is constructively discharged when "working conditions deteriorate, as a result of discrimination, to the point that they become sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job[.]" Poland v. Chertoff, 494 F.3d 1174, 1184 (9th Cir. 2007). Plaintiff argues that he was compelled to

7 Opinion and Order

resign because he received disproportionate scrutiny in the investigation of his policy violations and because Ragon's display of the Single Handed lithograph created intolerably racist conditions. In this case, the record does not disclose a jury issue concerning whether working conditions at TGS were sufficiently egregious to overcome the normal motivation of a reasonable employee to remain on the job.

Concerning Ragon's investigation of plaintiff, the record indicates that plaintiff testified that Ragon's review of plaintiff's notebooks and laptop was appropriate (see section II, infra). Plaintiff further testified that no employee with his disciplinary history was treated in a more lenient manner. He admits having violated OSP policies and stated that those violations warranted discipline. Plaintiff nonetheless argues that he should have received a more lenient sanction. In the absence of any comparator evidence (see sections II and V, infra), plaintiff's contention is impossible to test; plaintiff points to no violation of OSP's own disciplinary practices.

Nor would Ragon's alleged display of the Single Handed lithograph create an environment so intolerable as to reasonably warrant an employee's resignation. The display of the artwork alone is not probative of bias against Native Americans. See Martin v. Port Authority Transit of Allegheny County, 115 Fed. Appx. 556, 557 (3d Cir. 2004) (depiction of African-American slave not probative of racial animus in employment discrimination case, inasmuch as art is inherently subjective and conveys particular meanings for individual viewers). Although a colleague of plaintiff declared that Ragon stated that he kept

8 Opinion and Order

the lithograph because it represented "a time when real men weren't afraid to confront the Indians all alone and deal with them," Pltf. Decl. in Response, Exhibit 11, at 7, there is no evidence that could support an inference that plaintiff knew that Ragon intended to use the artwork to intimidate plaintiff or to demonstrate his bias. Plaintiff does not direct the court to any evidence that the colleague even communicated this alleged remark to him.

Further, although plaintiff had complained about other instances of offensive conduct while working at OSP, he failed to communicate that he found the artwork offensive, and he never asked Ragon to consider removing it. Nor did plaintiff initiate a formal complaint or have reason to believe the complaint process would have been futile. Under these circumstances, no reasonable juror could determine that resignation was a reasonable course of action, and therefore no deprivation of any alleged property interest has been demonstrated.

Furthermore, plaintiff cannot demonstrate that he was deprived of constitutionally adequate process for any of the disciplinary actions taken against him. Under Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 546 (1985), an employee with a constitutionally protected property interest in his employment "is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." Here, the record indicates that plaintiff underwent a personnel investigation and received notice of the allegations and evidence against him during the personnel investigations, and he had the opportunity

9 Opinion and Order

to rebut the allegations. He availed himself of union representation during the investigations. Thus, no triable issue remains on a due process based section 1983 claim founded on personnel investigations or discipline.

To the extent that plaintiff also contends that Ragon deprived him of a liberty interest without due process when he took plaintiff and other colleagues to Ragon's home during work hours, this argument is unavailing. As Ragon explains, plaintiff and colleagues went to the house to learn the route in the event of a later carpool, and there is no evidence that plaintiff was taken to Ragon's house against plaintiff's will or was uncompensated for that time. On this record, plaintiff's due process-based section 1983 claims fail, and summary judgment in Ragon's favor is appropriate.

## II. Section 1983 Equal Protection Claim

Plaintiff asserts that defendant Ragon "acted in a discriminatory manner towards plaintiff by creating a hostile work environment toward plaintiff because he is Native American", driving him of a right to equal protection under the law. First Amended Complaint, ¶ 25.

In order to withstand summary judgment, plaintiff must demonstrate a triable issue on the question whether Ragon purposefully discriminated against him on the basis of his race. See Lowe v. City of Monrovia, 775 F.2d 998, 1010 & n. 10 (9th Cir. 1985). Proof of intentional discrimination is measured against the Title VII standard. Id. at 1011. Thus, plaintiff may carry the burden by establishing a prima facie case of

10 Opinion and Order

disparate treatment under the <u>McDonnell Douglas</u> standard, or by presenting direct or circumstantial evidence of discriminatory treatment. <u>Id</u>. at 1009.

Under the relevant standards, the record does not disclose a genuine issue of material fact on the question of disparate treatment. For that reason, summary judgment is granted Ragon on the section 1983 equal protection claim.

<u>Direct or Circumstantial Evidence</u>

Plaintiff argues that the record discloses circumstantial evidence of Ragon's bias against Native Americans. He bases his argument on the assertion that Ragon displayed in his office a copy of the lithograph <u>Single Handed</u> by Western artist Charles Russell. The artwork depicts an apparently Caucasian mounted police officer on horseback pointing a rifle at a Native American. Plaintiff stated in his resignation letter that the subject of the artwork was offensive, but (as explained above), he did not express that concern to Ragon or any supervisor at OSP prior to his resignation.

Display of the artwork alone would not support plaintiff's claim of intentional discrimination. <u>Martin v. Port Authority Transit of Allegheny County</u>, 115 Fed. Appx. 556, 557 (3d Cir. 2004), is instructive. There, an African-American plaintiff, who had a history of policy violations and poor job evaluations was terminated. She sued her employer under Title VII, alleging discrimination on the basis of race, and appealed the district court's exclusion of evidence that her supervisor displayed a poster of a slave that had offended the plaintiff. The poster depicted an African-American female slave, standing erect, with

11 Opinion and Order

scars on her back.    The plaintiff argued that the display demonstrated the supervisor lacked "sensitivity to the feelings of African-Americans" and "condoned the physical abuse of African-Americans."    Martin, 115 Fed. Appx. at 559.    The plaintiff also argued that the poster was relevant because her supervisor did not take it down after receiving an anonymous complaint describing her as a racist or after a supervisor requested that she remove it.    Id.

The Court of Appeals for the Third Circuit explained that it was not error to conclude that the display was not probative of racial bias where nothing in the record suggested that the supervisor condoned the abuse of African Americans.    The court explained,

> We realize that "beauty resides in the eyes of the beholder."  Moreover, Aesop reminds us that "one man's meat is another man's poison."    Therefore, we recognize that not everyone will view the poster in the same way or attach the same significance to it that the sculptor did.  That does not, however, mean that it reflects [the supervisor's] insensitivity or racism.  The magistrate judge properly exercised her discretion in heading off a debate about a work of art that doesn't appear very probative of the point [the plaintiff] seeks to wrench from it.  There is nothing in the record to suggest that [the supervisor] condoned the physical abuse of African Americans, or that the poster suggests that she does.

Id.

In this case, display the Single Handed lithograph alone cannot give rise to the inference that Ragon intended to discriminate against plaintiff on the basis of his Native American heritage.    The artwork portrays a historically inspired scene in which a mounted officer points a rifle at a Native American's head with a community of Native Americans looking on.

Like the poster in <u>Martin</u>, the artwork might be understood to portray the oppression of a minority group, a historical moment, a set of values, or any number of other meanings that a viewer may impute to it.

However, plaintiff argues that the instant case is distinguishable because, the lithograph, when viewed in the context additional evidence in the record, produces a jury question on Ragon's discriminatory intent. Plaintiff points to the declaration of one of plaintiff's TGS colleagues, Scott Eberz. Eberz declared:

> When Ragon was assigned to TGS, as was moving into his new office, he hung a framed lithograph of a civil war era trooper or mountie sitting on horseback pointing a long gun at a man in native dress who was standing before the trooper. I was offended when I saw this. I told Ragon that he may want to rethink the artwork as it could offend tribal members who often come to TGS for meetings and training. Ragon spoke at length about how the lithograph was based on fact and it represented "a time when real men weren't afraid to confront the Indians all alone and deal with them."

Pltf. Decl. in Response, Exhibit 11, at 7. Ragon denies that he made the statement. Ragon's Response to Pltf. Reply to Concise Statement, ¶ 15. Mindful that the statement Eberz imputes to Ragon is uncross-examined hearsay, I understand it as admissible at this stage under the hearsay exception for evidence of the hearsay declarant's state of mind. Fed. R. Evid. 803(3). Under this exception, the statement arguably could indicate to a juror that Ragon believed Indians had to be "managed" by white men using violent means and that whites were entitled to exert power over them, and a juror might thus infer that Ragon held a

13 Opinion and Order

negative view of Native Americans.[3]

Nonetheless, plaintiff cannot demonstrate that he was treated differently from other similarly situated employees supervised by Ragon, or that any adverse employment action was motivated by discriminatory intent (see below). Accordingly, his equal protection based section 1983 claim fails.

McDonnell Douglas Test

In order to withstand summary judgment under the McDonnell Douglas standard, plaintiff must demonstrate the existence of a genuine issue of fact on the prima facie elements, showing that: (1) he is a member of a protected class; (2) he was qualified for his position; (3) he experienced an adverse employment action; and, (4) similarly situated individuals outside his protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination. Fonseca v. Sysco Food Serv. of Arizona, Inc., 374 F.3d 840, 847 (9th Cir. 2004) (quoting Peterson v. Hewlett-Packard Co., 358 F.3d 599, 604 (9th Cir. 2004)). Ragon may rebut the prima facie case by providing evidence that it had a legitimate, nondiscriminatory reason for the alleged discriminatory treatment. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).

If Ragon meets that burden, in order to withstand summary judgment, plaintiff must then demonstrate the existence of a

_____

[3] I note that such an inference, based upon an alleged comment on a piece of art, is highly speculative. The declarant's statement might just as well have been understood as an appreciation of Russell's portrayal of the mounted policeman's courage.

14 Opinion and Order

genuine issue of material fact on whether Ragon's proffered reasons are pretextual. In this case, plaintiff has not met his burden to set forth a prima facie demonstration under McDonnell Douglas, and so the inquiry ends after the initial four elements in the burden-shifting process.

As a Native American, plaintiff is a member of a protected class. See Gensaw v. Del Norte County Unified School Dist., No. C 07-3009 TEH, 2008 WL 1777668 (N.D. Cal., Apr. 18, 2008) (applying equal protection clause in Native American students' challenge to school closure).

I turn next to the question whether plaintiff was qualified for his position. The record indicates that plaintiff had a record of personnel and performance problems. After Ragon's investigation revealed that plaintiff abused break time and inaccurately billed his time, plaintiff received a six-month pay reduction. Ragon also investigated and disciplined plaintiff for excessive telephone charges and violating OSP break policy. Prior to that, Burdick investigated and disciplined plaintiff for work absence due to alcohol intoxication. In addition to the personnel problems, plaintiff was required to remediate writing deficiencies. Plaintiff also testified that he violated OSP rules by viewing internet sites and DVDs portraying nudity and sexual activity while at work. Despite these problems, however, evidence in the record could allow a factfinder to determine that plaintiff was qualified for his position.

Next, the court considers whether a genuine issue of material fact exists on the question whether plaintiff experienced an adverse employment action. "[A]n adverse

15 Opinion and Order

employment action exists where an employer's action negatively affects its employee's compensation." Fonseca, 374 F.3d at 847. Such actions can include a pay reduction, delay in issuing a paycheck, negative review, transfer of job duties, or undeserved performance ratings. Id. In this case, plaintiff underwent investigation and discipline for violating break and telephone policy, and for absence from work due to intoxication. Plaintiff also argues that he suffered the adverse employment action of constructive discharge; for reasons explained infra (section VII, Wrongful Termination), that argument fails, and I do not consider it here.

Plaintiff fails on the final element, however. The record does not demonstrate a genuine issue of material fact indicating that plaintiff was subjected to disparate treatment based on race. Plaintiff lists a number of instances in which Ragon is alleged to have treated him differently from similarly situated employees, but a systematic review of the record indicates that plaintiff's arguments are unavailing.

First, plaintiff asserts that plaintiff was treated differently because he was investigated and disciplined for excessive telephone charges and abuse of breaktime during a work trip to Australia. However, the record indicates that a colleague who is not a member of the protected class, Narvaez, was investigated for the same offense and received the same discipline.

Plaintiff next asserts that Ragon subjected him to heightened scrutiny by reviewing his notebooks and billing records. The record instead indicates that Ragon reviewed all

16 Opinion and Order

subordinates' notebooks during personnel investigations, including subordinates who are not members of the protected class. No evidence in the record indicates that plaintiff received disproportionate scrutiny of his billing records.

Further, plaintiff did not receive disproportionate scrutiny concerning his writing skills; another employee, Narvaez, exhibited similar deficiencies and received the same assistance as plaintiff.

Nor did plaintiff receive disproportionate scrutiny when Ragon seized his computer; the record indicates that, in the course of personnel investigations those under review were required to surrender their computers, and plaintiff's computer was seized after it was reported that he had deleted certain files.

Finally, plaintiff did not receive disproportionate discipline for abusing break time and inaccurate billings; plaintiff has testified that he knew of no other OSP employee with his disciplinary history who received more lenient treatment. Plaintiff asserts that Caucasian colleagues, Howery, Olsen, and Westbrook, received a different penalty for abuse of break time than plaintiff, but the record indicates that these employees occupied different ranks and reported to different supervisors and were therefore not investigated by Ragon. Pltf. Response to First Concise Statement, 17; Ragon Decl. in Support of Reply, ¶¶ 7-8. As such, they are not appropriate comparators. See Moran v. Selig, 447 F.3d 748, 755 (9th Cir. 2006) (requiring comparators to be alike "in all material respects").

Because plaintiff has not met his burden to demonstrate a

17 Opinion and Order

prima facie case for discrimination, summary judgment on the section 1983 claim Ragon is granted.

III.  Equal Protection (Class of One)

In short, plaintiff asserts that he comprises a "class of one," and that Ragon alleged discriminatory actions violate his right to equal protection under the law.  The class-of-one theory does not apply in the public employment context.  See Engquist v. Oregon Dept. of Agriculture, 128 S. Ct. 2146 (2008).  The court grants Ragon's motion for summary judgment on this claim.

IV.  Section 1983 First Amendment Claims

Plaintiff alleges that Ragon restricted his First Amendment right to freedom of speech when he allegedly retaliated against him for "complaining about improper activities within his unit." First Amended Complaint, ¶ 25.

In order to withstand summary judgment on this claim, plaintiff must show that (1) he engaged in protected speech, and (2) a jury question exists on the question whether individual defendants took adverse employment action against him, and (3) that the speech was a substantial and motivating factor for the adverse action.  Marable v. Nitchman, 511 F.3d 924, 929 (9th Cir. 2007).  If the plaintiff meets that burden, the defendant may nonetheless prevail by demonstrating that he or she would have taken the same action in the absence of any protected speech. Roe v. City of San Diego, 356 F.3d 1108, 1112, rev'd on other grounds, 543 U.S. 77 (2004).

Whether plaintiff's speech is protected under the First Amendment is a question of law, which the court evaluates under the standard set forth in Garcetti v. Ceballos, 547 U.S. 410 (2006). Under Garcetti, a public employee's speech is only constitutionally protected if the employee spoke "as a citizen on a matter of public concern." Id. at 419. An expression made pursuant to a public employee's official duties, or "speech that owes its existence to a public employee's professional responsibilities," does not constitute speech made in the employee's capacity as a citizen speaking out on a matter of public concern. Id. at 1960. As such, it may be restricted by the employer and cannot form the basis of a free expression claim.

Plaintiff has not specified which speech warrants First Amendment protection. No words were specified in the complaint or in the response to Ragon's motion for summary judgment. Even assuming that any of plaintiff's speech warranted constitutional protection, plaintiff's claim nonetheless fails because there is no evidence that Ragon retaliated against plaintiff because of any complaint. As explained above, plaintiff resigned on August 8, 2005. Only at that point did plaintiff notify OSP of his allegations that Ragon discriminated against him, leaving no occasion for any retaliatory action. Plaintiff was not subjected to disparate treatment when he was employed. Thus, assuming that plaintiff's complaints comprise the alleged protected speech to which plaintiff referred, and assuming that any of it warranted protection, there is no evidence that Ragon took an action against plaintiff because of it.

19 Opinion and Order

1   Summary judgment in favor of Ragon on this claim is

2   appropriate.

4   V.  Title VII and Or. Rev. Stat. § 659A.030 Claims[4]

5   Hostile Work Environment

6   Under Title VII, it is unlawful for an employer "to fail or

7   refuse to hire or to discharge any individual, or otherwise to

8   discriminate against any individual with respect to his

9   compensation, terms, conditions, or privileges of employment,

10  because of such individual's race, color, religion, sex, or

11  national origin." 42 U.S.C. § 2000e-2(a)(1).   Title VII is

12  violated if harassment on the basis of race is so severe or

13  pervasive as to create a hostile work environment. See Kortan v.

14  CYA, 217 F.3d 1104, 1109 (9th Cir. 2000) (describing standard in

15  context of gender discrimination).   Defendant OSP moves for

16  summary judgment on the hostile work environment claim on the

17  basis that facts in the record cannot demonstrate the level of

18  severity required to constitute a hostile work environment.   The

19  court agrees.

20  In order to prevail on a hostile work environment claim,

21  plaintiff must show:  "1) that he was subjected to verbal or

22  physical conduct of a racial or sexual nature; (2) that the

23  conduct was unwelcome; and, (3) that the conduct was sufficiently

24  severe or pervasive to alter the conditions of the plaintiff's

25  employment and create an abusive work environment." Vasquez v.

27  [4] The court applies the same analysis to plaintiff's federal and
    state law hostile work environment and disparate treatment claims.
28  See Hardie v. Legacy Health System, 6 P.3d 531, 537 (Or. App. 2000),
    rev. denied, 36 P.3d 973 (Or. 2001).

20 Opinion and Order

County of Los Angeles, 349 F.3d 634, 642 (9th Cir. 2003).    At
issue is the third prong of the inquiry.

Whether an employer's conduct rises to the level of severity
required to state a hostile work environment claim is a question
of law.    Fuller v. City of Oakland, 47 F.3d 1522, 1527 (9th Cir.
1995).    The court examines "all the circumstances, including the
frequency of the discriminatory conduct; its severity; whether it
is physically threatening or humiliating, or a mere offensive
utterance;    and    whether    it    unreasonably    interferes    with    an
employee's    work    performance."    Clark    County    Sch.    Dist.    v.
Breeden,    532    U.S.    268,    270-71    (internal    quotation    marks    and
citation    omitted),    reh'g    denied,    533    U.S.    912    (2001).    "The
working    environment    must    both    subjectively    and    objectively    be
perceived    as    abusive."    Brooks v. City of San Mateo, 229 F.3d
917, 923 (9th Cir. 2000) (internal quotation marks and citation
omitted).

Conduct, even if discriminatory, will not create a hostile
work environment unless it interferes with an employee's job
performance unreasonably or imposes such intolerable conditions
as    to    be    abusive.    Compare    EEOC    v.    National    Education
Association, 422 F.3d 840, 847 (9th Cir. 2005) (daily physical
and    verbal    intimidation    can    constitute    a    hostile    work
environment), with Faragher v. City of Boca Raton, 524 U.S. 775,
788 118 S. Ct. 2275, 141 L. Ed.2d 662 (1998), and Porter v. Cal.
Dep't of Corr., 419 F.3d 885, 893 (9th Cir. 2005) (teasing,
offhand comments, isolated incidents of offensive conduct fail to
support claim of discriminatory harassment).

Plaintiff asserts that he was subjected to a hostile work

environment because (1) Burdick stated on at least two occasions between 1998 and 2001 that two tribal members were unintelligent, and Burdick asked why members of plaintiff's tribe are "ugly"; (2) Bathke accused plaintiff of leaving a telephone message at Bathke's home that included a tape recording of Bathke's voice; (3) Ragon took plaintiff on a tour of Ragon's home, where artwork apparently depicting the U.S. Confederate army was displayed; (4) plaintiff was allegedly disproportionately disciplined for taking long breaks and viewing inappropriate material in the workplace; (5) Ragon allegedly displayed the Single Handed lithograph in his office at TGS; and, (6) Ragon's manner with plaintiff and others was rude and brusque.

These facts do not objectively constitute abusive treatment. As explained above, the record does not substantiate plaintiff's assertion that he was subjected to heightened scrutiny or discipline.  The brusque treatment by Ragon and Bathke, if true, and displays of historical artwork by Ragon do not rise to the level of intimidation of humiliation that characterizes a colorable hostile work environment claim.  Furthermore, in the absence of any disparate treatment, no discriminatory intent is apparent.

Burdick's racially insensitive remarks, though subjectively and objectively offensive, were isolated incidents and do not rise to the magnitude of severity that would pervasively and substantially impair the work environment.  For example, it is far from clear that Burdick's derogatory comment about the intelligence of the two members of plaintiff's tribe was based upon their race; nonetheless assuming such an inference could be

22 Opinion and Order

drawn, such represents an isolated incident. Considering all the circumstances, no triable issue exists about whether the conduct was frequent or abusive enough to interfere unreasonably with plaintiff's employment. Summary judgment on this claim is granted.

Disparate Treatment

In order to withstand summary judgment on his disparate treatment claim, plaintiff may either demonstrate a triable issue based on direct or circumstantial evidence that he was the target of intentional race-based discrimination, or he may make his case under the McDonnell Douglas framework. To prevail in the latter, plaintiff must demonstrate the existence of a genuine issue of fact on the prima facie elements, showing that: "(1) he is a member of a protected class; (2) he was qualified for his position; (3) he experienced an adverse employment action; and, (4) similarly situated individuals outside his protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination." Fonseca v. Sysco Food Serv. of Arizona, Inc., 374 F.3d 840, 847 (9th Cir.2004) (quoting Peterson v. Hewlett-Packard Co., 358 F.3d 599, 604 (9th Cir. 2004)). OSP may rebut the prima facie case by providing evidence that it had a legitimate, nondiscriminatory reason for the alleged discriminatory treatment. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).

If OSP meets that burden, in order to withstand summary judgment, plaintiff must then demonstrate the existence of a

23 Opinion and Order

genuine issue of material fact on whether OSP's proffered reasons are pretextual. "[A] plaintiff can prove pretext either (1) indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer." Lyons v. England, 307 F.3d 1092, 1113 (9th Cir. 2002) (internal quotation marks omitted). The evidence used to establish the plaintiff's prima facie case alone may rebut a defendant's evidence and show that the defendant's proffered reason for the adverse action is a pretext. Chuang v. Univ. of Cal. Davis, Bd. of Trustees, 225 F.3d 1115, 1127 (9th Cir. 2000). In this case, plaintiff has not met his burden on the prima facie case, and therefore the court ends the inquiry after the initial step in the burden-shifting analysis.

With regard to direct or circumstantial evidence of intentional discrimination, plaintiff relies on the same evidence concerning Ragon's asserted racial bias against Native Americans (the Single Handed lithograph and Eberz's hearsay statement). As explained above, although that evidence could raise an inference that Ragon harbored a racial bias, plaintiff has not demonstrated that he was treated differently based upon his race. In this Title VII claim against OSP, plaintiff also adduces Burdick's derogatory remarks concerning Native Americans. However, plaintiff has failed to demonstrate any disparate treatment or adverse employment action taken by Burdick. In the absence of any such evidence plaintiff's claim cannot survive.

With respect to the McDonnell Douglas analysis, as noted in

24 Opinion and Order

the discussion of the section 1983 Equal Protection claim against Ragon, plaintiff has met his burden on the first three steps of the prima facie case.   Again, however, plaintiff fails on the final element.

Under the final element, the question turns to whether circumstances surrounding the adverse employment action of investigation and discipline give rise to an inference of discrimination or whether plaintiff was treated differently from similarly situated individuals outside the protected class.  With the exception of one item, plaintiff adduces the same evidence that the court considered above in the discussion of the section 1983 Equal Protection claim against Ragon only.

The additional evidence concerns instances in which plaintiff claims that he was treated more harshly when he viewed inappropriate material on an OSP computer than Caucasian employees who violated the same policy.   However, the Caucasian to whom plaintiff refers is not similarly situated, inasmuch as he was supervised by an individual other than Ragon, occupied a different rank, and viewed the inappropriate material on a personal computer during break time.   Pltf. Response to First Concise Statement, 17.

As explained above in my discussion of plaintiff's Equal Protection based section 1983 claim against Ragon only, plaintiff has not demonstrated that he was treated differently from others supervised by Ragon during the time plaintiff was employed at TGS.

For these reasons, plaintiff's Title VII and Or. Rev. Stat. section 659A.030 claims against OSP cannot withstand summary

25 Opinion and Order

1    judgment.

2

3    VI.  Whistleblower Retaliation

4        Plaintiff asserts two claims under the state whistleblower

5    statute.  In the first, he asserts that OSP violated state laws

6    prohibiting employers from taking (or threatening to take)

7    disciplinary action against an employee for disclosing evidence

8    of a violation of state or federal law, or evidence of

9    mismanagement or a gross waste of funds when it assertedly

10   subjected plaintiff to heightened scrutiny after: (1) plaintiff's

11   complaint to Burdick about racial bias after hearing Burdick make

12   derogatory comments about certain Native Americans, (2)

13   plaintiff's complaint about billing practices to Westbook, (3)

14   plaintiff's report to Bathke that Burdick had given them an extra

15   day off during a work trip, apparently in violation of an OSP

16   policy, and (4) plaintiff's statement to Bathke that Burdick

17   struck plaintiff's computer with his fist when plaintiff

18   requested new equipment.  See Or. Rev. Stat. § 659A.203(1)(b).

19       In the second claim, plaintiff asserts that OSP violated

20   state laws prohibiting an employer from discouraging an employee

21   from discussing the mismanagement or violations of a law when OSP

22   seized plaintiff's computer.  See Or. Rev. Stat. §

23   659A.203(1)(d).

24       The relevant section of the state code is Or. Rev. Stat.

25   section 659A.203, excerpted here in part:

26

27       (1) . . . it is an unlawful employment practice for
         any public employer to:

28

         26 Opinion and Order

. . . .

(b) Prohibit any employee from disclosing, or take or threaten to take disciplinary action against an employee for the disclosure of any information that the employee reasonably believes is evidence of:

(A) A violation of any federal or state law, rule or regulation by the state, agency or political subdivision;

(B) Mismanagement, gross waste of funds or abuse of authority or substantial and specific danger to public health and safety resulting from action of the state, agency or political subdivision[.]

. . . .

(d) Discourage, restrain, dissuade, coerce, prevent or otherwise interfere with disclosure or discussions described in this section.

Plaintiff's first claim contends that OSP violated subparagraph (1)(b)(A) or (1)(b)(B) by assertedly subjecting plaintiff to heightened scrutiny after plaintiff made the disclosures listed above. Plaintiff's claim fails because none of the disclosures are protected under either subparagraph (1)(b) (A) or (1)(b)(B). No fact in the record indicates that plaintiff reasonably believed that Burdick's racially insensitive remarks violated federal or state law, as required by subparagraph (1)(b) (A). Nor is the disclosure a qualifying disclosure concerning "mismanagement" under subparagraph (1)(b)(B). Under Oregon law, qualifying disclosures concerning "mismanagement" must "refer to serious agency misconduct having the effect of actually or potentially undermining the agency's ability to fulfill its public mission." Bjurstrom v. Oregon Lottery, 120 P.3d 1235, 1241 (Or. App. 2005). Such statements do not include "routine complaints about policies that employees must implement or

27 Opinion and Order

practices that employees do not like." _Id._ The racially
inappropriate remarks were simply "not of a magnitude that could
affect the agency's stewardship of public funds or its ability to
fulfill its mission." _Id._ at 1242. Even if plaintiff's
disclosure were protected under state law, there is no evidence
that OSP took or threatened any action against him to making the
disclosure. Rather, plaintiff's complaint was expressed
internally, to the supervisor who uttered the offending comments
in order to address plaintiff's concern about racial bias.

Plaintiff's remaining statements do not qualify under either
subparagraph (1)(b)(A) or (1)(b)(B). The objectionable billing
practices concerned procedures for billing drive time between
Salem and casinos, accounting for time worked in the capacities
of vendor detective and casino oversight, accounting for time
spent moving through casinos and interacting with various casino
personnel, billing time spent doing work for one casino to a
second casino that was used as the workspace, and billing in 30
minute increments for work or communications that took 10 or 15
minutes. All were complaints made within OSP.

Plaintiff's other disclosures are internal complaints about
Burdick's behavior on one occasion, and his permission to allow
employees to take a free day during a work trip.

There is no evidence in the record any of the practices had
a "significant impact on the agency's fiscal condition or its
ability to perform its function," as required to demonstrate a
qualifying disclosure about "mismanagement" under subparagraph
(1)(b)(B). _See id._ Furthermore, plaintiff does not indicate
which OSP rules the practices supposedly violated so as to make

28 Opinion and Order

his disclosure protected under subparagraph (1)(b)(A). Plaintiff's internal complaints are instead "routine complaints about policies that employees must implement or practices that employees do not like" that do not rise to the level required to qualify as protected disclosures.

Plaintiff's second claim alleges that OSP stifled his discussion of objectionable billing practices when it seized his computer. In plaintiff's view, this action violated Or. Rev. Stat. section 659A.203(1)(d), which states that employers may not "[d]iscourage, restrain, dissuade, coerce, prevent or otherwise interfere with disclosure or discussions described in this section." Again, plaintiff fails to assert a qualifying disclosure. Further, plaintiff appears to argue that by seizing his computer, OSP restrained plaintiff from further discussing the objectionable billing practices, but no evidence in the record indicates how deprivation of the computer restrained plaintiff. Plaintiff points to no evidence concerning, for example, relevant electronic files that were stored on the computer that plaintiff intended to use in order to further his disclosures, or evidence of any chilling effect the seizure had on plaintiff's disclosures. In sum, neither of plaintiff's Or. Rev. Stat. section 659A.203(1) whistleblower claims withstand summary judgment.

VII.  Wrongful Termination

Plaintiff bases his wrongful discharge claim on the theory that he was constructively discharged after having complained about discrimination against him on the basis of his race or

29 Opinion and Order

national origin and after having complained internally about TGS
billing practices.[5]  Thus, in order to state a wrongful discharge
claim, plaintiff must first establish that he was discharged
constructively.  See generally McGanty v. Stadenraus, 901 P.2d
841, 854 (Or. 1995).

"[T]o establish a constructive discharge stemming from
unacceptable working conditions, a plaintiff must prove (1) that
the employer deliberately created or deliberately maintained the
working condition(s) (2) with the intention of forcing the
employee to leave the employment, and (3) that the employee left
employment because of the working conditions."  Id. at 854.

The record does not give rise to a triable issue on whether
OSP created intolerable or infeasible working conditions designed
to force plaintiff to leave his job.  Plaintiff has pointed to no
evidence in the record indicating that OSP intended or planned to
subject plaintiff to conditions so intolerable that he would have
no reasonable choice than to resign.  Plaintiff's complaints
about racial discrimination to Burdick were not met with any
retaliation.  Plaintiff's complaints about Ragon's display of the
Single Handed lithograph at the office were not made known to any
supervisor until plaintiff resigned; thus, there was no occasion
to retaliate against him even if OSP were inclined to do so.  As
explained above, while plaintiff was employed, he was not
subjected to disproportionate investigation or discipline based

---

[5] OSP argues that the wrongful discharge claim is precluded by
the availability of adequate statutory remedies.  However, no
statutory claim plaintiff makes against defendant OSP includes
noneconomic damages; as such, I cannot hold that this avenue of relief
is precluded.  See generally Olsen v. Deschutes County, 127 P.3d 655,
661 (Or. App.), rev. denied, 136 P.3d 1123 (Or. 2006).

30 Opinion and Order

1    on his race.

2        Plaintiff asserts that OSP reacted adversely to plaintiff's

3    billing complaints by later seizing his computer.    Even if there

4    were    a    relationship    between    the    seizure    and    plaintiff's

5    complaints, this incident alone does not rise to the level of

6    creating working conditions that are so intolerable as to make

7    resignation a reasonable response.    Summary judgment in granted

8    in OSP's favor on plaintiff's wrongful termination claim.

9

10    VIII.    Intentional Infliction of Emotional Distress

11        In order to withstand summary judgment on the intentional

12    infliction of emotional distress claim, plaintiff must show the

13    existence of a genuine issue of material fact on each of three

14    elements: (1) intent to commit actions (2) that "extraordinarily

15    transgress[] the bounds of socially tolerable conduct" (3) and

16    that caused severe emotional distress to plaintiff.    Babick v.

17    Or. Arena Corp., 40 P.3d 1059, 1063 (Or. 2001).

18        Whether    a    complaint    sufficiently    alleges    conduct    that

19    constituted    an    extraordinary    transgression    of    the    bounds    of

20    socially tolerable conduct is a question of law.    See id. at

21    1064.    A defendant's conduct is sufficiently transgressive when

22    it "so extreme in degree, as to go beyond all possible bounds of

23    decency, and to be regarded as atrocious, and utterly intolerable

24    in    a    civilized    community."    Christopherson    v.    Church    of

25    Scientology, 644 P.2d 577, 584  n.7 (Or. App.), rev. denied, 650

26    P.2d 928 (Or. 1982).    "The defendant's conduct must be extremely

27    outrageous, not merely rude, tyrannical, churlish, or mean."

28    Santrizos v. Evergreen Federal Savings and Loan Ass'n., Civ. No.

31 Opinion and Order

06-886-PA, WL 283024, *3 (D. Or., Jan. 18, 2007). Oregon case law sets a high threshold for outrageous conduct in employment contexts; "Oregon appellate courts have been very hesitant to impose liability for IIED claims in employment settings, even in the face of serious employer misconduct." Robinson v. U.S. Bancorp, Civ. No. 99-1723-ST, WL 435468, *8 (D. Or., Mar. 17, 2000). Thus, subjecting employees to threats of termination, tantrums, insults, unreasonable demands, and discriminatory comments will not rise to actionable conduct unless the employer's actions are egregiously cruel. See id. (citing cases). Moreover, "[d]ischarge alone is not actionable[.]" Galenbeck v. Newman & Newman, Inc., No. 02-6278-HO, WL 1088289 at *8 (D. Or., May 14, 2004).

Plaintiff has not alleged with specificity any qualifying "outrageous" conduct. Each of the particular facts plaintiff discusses in its motion briefing fall short of the qualifying standard: The action that OSP took in investigating and disciplining plaintiff does not begin to approach the level of magnitude required to reach "all possible bounds of decency." The alleged display of the Single Handed lithograph is likewise not within the realm of qualifying conduct, nor is Ragon's display of artwork depicting the confederate army at his home; moreover, there is no evidence in the record that permits an inference that Ragon intended to commit an extraordinarily transgressive offense by displaying it at work.

Finally, Burdick's racially insensitive comments, in which he referred to particular Native American tribal members as unintelligent and referred to members of the particular tribe to

32 Opinion and Order

which plaintiff belonged as "ugly," do not amount to "atrocious and utterly intolerable." As distasteful as they were, the comments were isolated and fall short of the type of egregiously cruel conduct that is redressable under Oregon tort law. Similarly, the comments alleged to have been made by Westbrook are likewise not pervasive enough to permit plaintiff to state an IIED claim. Summary judgment is granted in OSP's favor on this claim.

### Conclusion

Defendant James Ragon's Motion for Summary Judgment (#45) and defendant Oregon State Police's Motions for Summary Judgment (#42 and #59) are granted and the claims are dismissed.

IT IS SO ORDERED.

Dated this __11__ day of July, 2008.

THOMAS M. COFFIN
United States Magistrate Judge

33 Opinion and Order